

ELECTRONIC

**Aug 2, 2011**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. · MIAMI

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
## 11-60184-CR-DIMITROULEAS/SNOW
CASE NO. _____

**18 U.S.C. § 371**

**UNITED STATES OF AMERICA**

v.

**MARTIN LACK,**
              **Defendant.**
_____/

## INDICTMENT

The Grand Jury charges that:

## BACKGROUND

At all relevant times, unless otherwise specified:

1.      United States citizens, resident aliens, and legal permanent residents of the United States had an obligation to report to the Internal Revenue Service ("IRS") on the Schedule B of a U.S. Individual Income Tax Return, Form 1040, whether that individual had a financial interest in, or signature authority over, a financial account in a foreign country in a particular year by checking "Yes" or "No" in the appropriate box and identifying the country where the account was maintained.  United States citizens and residents had an obligation to report all income earned from foreign bank accounts on the tax return.

2.      United States citizens, resident aliens, and legal permanent residents of the United States who had a financial interest in, or signature authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a

particular year were required to file with the Department of the Treasury a Report of Foreign Bank and Financial Accounts, Form TD F 90-22.1 (the "FBAR").  The FBAR for the applicable year was due by June 30 of the following year.

3.      An "undeclared account" was a financial account owned by individuals subject to United States tax and maintained in a foreign country that has not been reported to the United States government on a tax return and an FBAR.

4.      Any person who was engaged in a trade or business, and who in the course of such trade or business received more than $10,000 in coins or currency, was required to file a Report of Cash Payments Over $10,000 Received in a Trade or Business, Form 8300 ("Form 8300"), with respect to such transaction (or related transactions) with the Financial Crimes Enforcement Network of the U.S. Department of Treasury.

5.      Individuals or firms that were paid to provide investment advice to United States customers about investing in securities generally were required to register with either the Securities and Exchange Commission ("SEC") and/or the state securities agency where they had their principal place of business.  To register with the SEC, an investment advisor had to fill out a Uniform Application for Investment Adviser Registration, Form ADV each year and file it with the SEC.

6.      The Offshore Account Voluntary Disclosure Program ("Voluntary Disclosure Program") was a program administered by the IRS that was intended to serve as a vehicle for U.S. taxpayers to disclose their previously undeclared offshore accounts and pay tax on the income earned in those accounts. Under the Voluntary Disclosure Program, the participants pay tax on the unreported income, a 20% accuracy penalty on the tax, and a 20% penalty on the high

2

balance of the undeclared account, together with interest, related to their failure to disclose their accounts in an attempt to avoid criminal prosecution. The IRS announced the First Voluntary Disclosure Program on March 23, 2009 and closed that program on October 15, 2009.

## PARTIES, PERSONS, and ENTITIES

7.     Defendant MARTIN LACK was a citizen and resident of Switzerland. From the early 1990's until approximately 2003, UBS AG ("UBS") employed defendant MARTIN LACK as a private banker and as executive director for its North America International business, which included the cross-border banking business. In 2003, defendant MARTIN LACK left UBS and was employed at Keusch & Merlo Invest AG, an investment advisory firm in Zurich, Switzerland. From approximately 2003 until present, defendant MARTIN LACK has operated as an independent investment advisor at Lack & Partner Asset Management AG in Zurich, Switzerland.

8.     Renzo Gadola, a co-conspirator, was a citizen of and resident of Switzerland, and was a registered investment advisor with the United States Securities and Exchange Commission. From approximately 1995 through August 2008, UBS employed Renzo Gadola as a private banker. In or about February 2009, Renzo Gadola began working in Switzerland as an independent investment advisor, doing business under the name RG Investment Partner AG and sharing office space with defendant MARTIN LACK.

9.     UBS AG ("UBS"), a corporation organized under the laws of Switzerland, directly and through its subsidiaries, operated a global financial services business. As one of the biggest banks in Switzerland and largest wealth managers in the world, UBS provided banking, wealth management, asset management and investment banking services, among other services,

3

around the globe, including through branches located in the United States (including the Southern District of Florida).

10.     A bank that was an independent, incorporated public-law institution wholly owned by Basel City Canton, Switzerland ("Cantonal Bank") provided cross-border banking services to U.S. customers. In 2000, Cantonal Bank entered into a Qualified Intermediary Agreement ("QI Agreement") with the IRS which commenced on January 1, 2001 and expired on December 31, 2006. The QI Agreement required Cantonal Bank to verify the identity and citizenship/domicile of its customers and to withhold and pay over to the IRS taxes on certain accounts beneficially owned by United States customers. On or about June 7, 2006, Cantonal Bank entered into the "Qualified Intermediary Agreement Renewal Instrument to effect the Second Agreement" ("QI Renewal Agreement") with the IRS, an agreement to renew the QI agreement for a term to run from January 1, 2007 through December 31, 2012. As part of the QI Renewal Agreement, Cantonal Bank declared that "it is currently in full compliance with the [QI Agreement] and intends to remain in full compliance."

11.     Unindicted co-conspirator S.L. ("Swiss Banker S.L.") was a banker at Cantonal Bank's private banking office in Zurich, Switzerland, who assisted United States customers to open and maintain undeclared accounts at Cantonal Bank.

## CONSPIRACY

12.     From in or about 1993, the exact date being unknown to the Grand Jury, to on or about November 8, 2010, in the Southern District of Florida and elsewhere, the defendant,

**MARTIN LACK,**

and individuals known and unknown to the Grand Jury, did unlawfully, voluntarily, intentionally

4

and knowingly conspire, combine, confederate, and agree together and with each other to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of revenue, to wit, income taxes.

## OBJECT OF THE CONSPIRACY

The object of the conspiracy was as follows:

13.    The defendant MARTIN LACK and his co-conspirators would and did defraud the United States by aiding and assisting U.S. customers to willfully evade their income tax obligations by, among other things, things, opening and maintaining undeclared bank accounts in Switzerland at UBS and Cantonal Bank with the intent of concealing the income and assets and filing false income tax returns that failed to disclose the undeclared accounts.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendant MARTIN LACK sought to accomplish the purpose of the conspiracy included, among others, the following:

14.    It was a part and object of the conspiracy that defendant MARTIN LACK would and did solicit U.S. customers to open undeclared accounts at UBS and Cantonal Bank because Swiss bank secrecy would assist U.S. customers to conceal their ownership of the accounts

15.    It was further a part of the conspiracy that MARTIN LACK, Renzo Gadola, and their conspirators would and did travel to the United States to provide investment advice to United States customers and to conduct banking with United States customers with undeclared Swiss accounts.

16.    It was further a part of the conspiracy that defendant MARTIN LACK would and

did cause Renzo Gadola and others to travel to the United States to meet with defendant MARTIN LACK's U.S. customers with undeclared accounts at Cantonal Bank after 2008 when defendant MARTIN LACK feared that he would be arrested by U.S. authorities.

17.     It was further a part of the conspiracy that defendant MARTIN LACK and Renzo Gadola would and did agree that Renzo Gadola would conceal his activities with U.S. customers with undeclared accounts at Cantonal Bank from U.S. authorities by claiming that he was legitimately in the United States providing investment advice as an SEC registered advisor.

18.     It was further a part of the conspiracy that defendant MARTIN LACK and his conspirators would and did provide unlicensed and unregistered banking services and investment advice to U.S. customers in person while on travel to the United States and by mailings, email, and telephone calls to and from the United States.

19.     It was further a part of the conspiracy that in or around 2008, as UBS was closing the undeclared accounts of U.S. customers, defendant MARTIN LACK and his conspirators would and did advise U.S. customers with undeclared UBS accounts in Switzerland that defendant MARTIN LACK could assist them in opening undeclared accounts at Cantonal Bank as defendant MARTIN LACK had a special relationship with bank management.

20.     It was further a part of the conspiracy that Cantonal Bank would and did pay commissions to defendant MARTIN LACK, Renzo Gadola, and their conspirators for referring United States customers who opened undeclared accounts at Cantonal Bank and transferred funds to the bank.

6

21.     It was further a part the conspiracy that defendant MARTIN LACK,

Renzo Gadola, and their conspirators would and did discourage U.S. customers from disclosing

their undeclared Swiss accounts to the IRS through the Voluntary Disclosure Program;

22.     It was further a part of the conspiracy that defendant MARTIN LACK would and

did set up, and caused to be set up and utilized, nominee tax haven entities to open undeclared

accounts at UBS and Cantonal Bank.

23.     It was further a part of the conspiracy that defendant MARTIN LACK and his

conspirators would and did cause U.S. customers to execute forms that directed Cantonal Bank

not to disclose their identities to the IRS.

24.     It was further a part of the conspiracy that defendant MARTIN LACK provided

cash in the United States to U.S. customers as withdrawals from their undeclared accounts.

25.     It was further a part of the conspiracy that defendant MARTIN LACK solicited

cash deposits in the United States from U.S. customers with undeclared accounts.

26.     It was further a part of the conspiracy that defendant MARTIN LACK and his

conspirators would and did assist United States customers with undeclared Swiss accounts at

Cantonal Bank in structuring the transfer of funds, including cash, within the United States

without disclosing such transfers to the United States government on a Form 8300 as required by

law.

27.     It was further a part of the conspiracy that defendant MARTIN LACK would and

did advise U.S. customers not to maintain in the United States records related to their undeclared

accounts.

7

28.    It was further a part of the conspiracy that defendant MARTIN LACK would and did assist a United States customer with an undeclared Swiss account at Cantonal Bank to conceal the account from the U.S. government by providing the United States customer with a prepaid cell phone that was to be used only for calls to be made by the United States customer to defendant MARTIN LACK in Switzerland.

29.    It was further a part of the conspiracy that defendant MARTIN LACK and his conspirators utilized correspondent bank accounts maintained by Cantonal Bank in the United States to conduct financial transactions that aided and assisted their U.S. customers in concealing their undeclared accounts.

30.    It was further a part of the conspiracy that certain U.S. customers would and did file false and fraudulent U.S. Individual Income Tax Returns, Forms 1040, which failed to report their respective interests in their undeclared accounts and the related income.

31.    It was further a part of the conspiracy that certain U.S. customers would and did fail to file and otherwise report their undeclared accounts on FBARs.

## **OVERT ACTS**

In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts were committed in the Southern District of Florida, and elsewhere:

### Customer 1

32.    In or about March 2000, defendant MARTIN LACK traveled to Atlanta, Georgia to inform Customer 1, a United States citizen and resident of Mississippi, and Customer 1's siblings that they inherited an undeclared account at UBS and that they would need to travel to Zurich, Switzerland, to open a new undeclared account to receive the inheritance.

33.     In or about 2002, defendant MARTIN LACK informed Customer 1 that defendant
MARTIN LACK was leaving UBS and taking approximately 150 clients with him.

34.     In or about Summer 2006, during a meeting in Mississippi for defendant
MARTIN LACK to prepare an estate plan for Customer 1, Customer 1 revealed to defendant
MARTIN LACK that over a number of years Customer 1 had accumulated a substantial cash
hoard that was stored in a safe deposit box.

35.     In or about January 2007, as directed by defendant MARTIN LACK, Customer 1
traveled to New Orleans, Louisiana, and, in a hotel room, gave defendant MARTIN LACK
one-half of the cash hoard, totaling approximately $200,000 in cash.

36.     On or about April 26, 2007, as directed by defendant MARTIN LACK, Customer
1 traveled to New Orleans, Louisiana, and, in a hotel room, provided defendant MARTIN LACK
with the remainder of the cash hoard, totaling approximately $245,000.

37.     On or about April 26, 2007, defendant MARTIN LACK provided Customer 1
with a receipt for $245,000, which noted  "Bank: [Cantonal Bank] ZH".

38.     In or about September 2007, defendant MARTIN LACK caused to be opened at
Cantonal Bank an undeclared bank account in the name of an offshore tax haven entity whose
beneficial owner was Customer 1, and defendant MARTIN LACK transferred Swiss Francs and
U.S. securities into this account.

39.     In or about Spring 2009, Customer 1 traveled to Zurich, Switzerland, and signed
certain documents at Lack & Partner Asset Management to close the undeclared account at
Cantonal Bank.

9

40. In or about Spring 2009, defendant MARTIN LACK told Customer 1 that, at the closure of Customer 1's undeclared account at Cantonal Bank, defendant MARTIN LACK had transferred the funds from the undeclared account at Cantonal Bank into defendant MARTIN LACK's business account and that defendant MARTIN LACK would wire the funds to Customer 1 in the United States.

41. In or about September 2009, defendant MARTIN LACK attempted to discourage Customer 1 from disclosing the undeclared accounts at UBS, Cantonal Bank and another Swiss bank to the IRS through the Voluntary Disclosure Program, telling Customer 1 not to participate in the Voluntary Disclosure Program because the undeclared UBS account was too small and that if Customer 1 did disclose the undeclared UBS account to the IRS, Customer 1 should not disclose the undeclared account at Cantonal Bank, as disclosure would bring trouble for both of them.

42. In or about September 2009, defendant MARTIN LACK called Customer 1 in the United States to dissuade Customer 1 from disclosing to the IRS the undeclared account at Cantonal Bank, telling Customer 1 that only five of defendant MARTIN LACK's customers had applied for the Voluntary Disclosure Program and that entering into the program was unnecessary.

43. In or about September 2009, in response to Customer 1 telling defendant MARTIN LACK that Customer 1 met with an attorney to enter into the Voluntary Disclosure Program, defendant MARTIN LACK proposed that Customer 1 provide the attorney with false explanations regarding the source of the funds in the Cantonal Bank account.

10

44.     In or about September 2009, defendant MARTIN LACK proposed to Customer 1 that defendant MARTIN LACK could create fake bank records that would misrepresent the funds in the undeclared bank account at Cantonal Bank as the proceeds of a loan.

45.     In or about Spring 2010, Customer 1 again requested that defendant MARTIN LACK repatriate Customer 1's funds by wiring the funds to either Customer 1 or Customer 1's attorney, but defendant MARTIN LACK refused to repatriate the funds using a wire transfer, instead instructing Customer 1 to travel to Zurich, Switzerland and retrieve the funds in cash.

46.     On or about June 1, 2010, defendant MARTIN LACK sent an email message to Customer 1 in the United States in which defendant MARTIN LACK stated that the contents of the undeclared bank account at Cantonal Bank could be repatriated to the United States either by physical transportation or by a wire transfer, but in order to conceal the true nature of the transaction, he could create false loan documents.

47.     On or about August 16, 2010, during a telephone conversation between Customer 1 in the United States and defendant MARTIN LACK, defendant MARTIN LACK advised Customer 1 not to disclose the undeclared account at Cantonal Bank and instead suggested that Customer 1 keep the money in Switzerland and repatriate the funds in small amounts in cash over time.

48.     On or about September 22, 2010, during a telephone conversation between Customer 1 in the United States and defendant MARTIN LACK, defendant MARTIN LACK stated that his partner "Renzo" would be in the United States and could meet with Customer 1 to discuss the undeclared account at Cantonal Bank and methods of repatriating the funds from the account.

11

49.    On or about October 29, 2010, defendant MARTIN LACK sent an email message

to Customer 1, copying Renzo Gadola, in which defendant MARTIN LACK stated:

> I am copying my partner Renzo Gadola on this mail.  This way you two
> can make detailed arrangements.  I gave him your phone number and
> suggest that he will contact you.  He left for the U.S. yesterday.  I think
> his first stop is in NYC.  I informed him about our past relationship and
> gave him my advice that he will discuss with you.

50.    On or about November 6, 2010, Renzo Gadola met with Customer 1 at a hotel in

Miami, Florida, and stated:

> In your particular instance [defendant MARTIN LACK] told me there is
> really, the likelihood that you will be found out, that they will somehow,
> you know, sometime, somehow find out about the account is practically
> zero percent.  So he really, he was very adamant about you not going
> forward and going through with the voluntary disclosure.

51.    Later in the conversation on or about November 6, 2010, Renzo Gadola stated in

regard to the undeclared account at Cantonal Bank:

> In your particular case, [defendant MARTIN LACK] told me because of
> the circumstances and the way, you know, everything happened, you
> should not go through [with] the voluntary disclosure.

52.    During the meeting on or about November 6, 2010, Renzo Gadola spoke on his

cell phone with defendant MARTIN LACK, who was in Switzerland, and then Renzo Gadola

told Customer 1:

> There is no paper trail because the money [was] put [in] cash in [Cantonal
> Bank].  [Defendant MARTIN LACK] then withdrew the money cash -
> it's in a safe in our office.  For about a year, the money has been out of
> [Cantonal Bank].  You have no link to UBS whatsoever, so 99.9% you
> have nothing to worry about.

53.    During the meeting with Renzo Gadola on or about November 6, 2010, Customer

1 spoke on the phone with defendant MARTIN LACK, who again instructed Customer 1 not to

disclose the undeclared Cantonal Bank account in the Voluntary Disclosure Program because there was no "paper trail" of the Cantonal Bank account or the funding of the Cantonal Bank account.

54.     On or about November 8, 2010, upon arrest by federal law enforcement officers, Renzo Gadola claimed that there must be some mistake, as he was a registered investment advisor with the SEC and produced documentation of his SEC registration.

Customer 2

55.     In or about 1993, at a meeting in Zurich, Switzerland, defendant MARTIN LACK introduced himself to Customer 2, a United States citizen and resident of Texas, as the new relationship manager for Customer 2's undeclared account at UBS.

56.     In or about 2003, defendant MARTIN LACK telephoned Customer 2 in the United States in which conversation defendant MARTIN LACK claimed that UBS would have to disclose Customer 2's ownership of the undeclared account at UBS because of UBS's recent acquisition of Paine Webber, and recommended that Customer 2 close the UBS account and open a new undeclared account at Cantonal Bank because Cantonal Bank would not disclose Customer 2's identity to U.S. authorities as it was a small Swiss bank with no operations in the United States.

57.     In or about February 2003, at a meeting with defendant MARTIN LACK in San Antonio, Texas, Customer 2 executed documents to open an undeclared account at Cantonal Bank and to transfer the contents of the undeclared account at UBS to the new undeclared account.

58.     In or about December 2003, at a meeting in Chicago, Illinois, defendant MARTIN LACK provided Customer 2 with approximately $30,000 in cash, that defendant MARTIN LACK stated he received from one of his United States customers who wanted to deposit money into that customer's undeclared account at Cantonal Bank.

59.     In or about December 2006, at a meeting in Chicago, Illinois, defendant MARTIN LACK provided Customer 2 with approximately $50,000 in cash, that defendant MARTIN LACK stated he received from one of his United States customers who wanted to deposit money into that customer's undeclared account at Cantonal Bank.

60.     In or about 2007, at a meeting in New Orleans, Louisiana, defendant MARTIN LACK provided Customer 2 with approximately $100,000 in cash that defendant MARTIN LACK stated he received from one of his United States customers who wanted to deposit money into that customer's undeclared account at Cantonal Bank.

61.     In or about August 2009, at a meeting in Zurich, Switzerland, defendant MARTIN LACK discouraged Customer 2 from entering the Voluntary Disclosure Program stating that as the balance of the undeclared account at UBS was so small, and based on leaked information and industry sources, defendant MARTIN LACK estimated that there was a less than 10% chance that UBS would disclose the identity of Customer 2 to the U.S. authorities.

Customer 3

62.     In or about 2002, defendant MARTIN LACK suggested to Customer 3, a United States citizen and resident of Illinois, to transfer Customer 3's undeclared account at UBS to Cantonal Bank, which defendant MARTIN LACK described as a small "state" bank with "good people" and with whom defendant MARTIN LACK had a good relationship.

14

63.     In or about 2002, at a meeting in Zurich, Switzerland, defendant MARTIN LACK assisted Customer 3 in creating two nominee tax haven entities to conceal his Swiss bank accounts, including a British Virgin Islands corporation and a Liechtenstein foundation.

64.     In or about 2002, at a meeting at the Cantonal Bank offices in Zurich, Switzerland with defendant MARTIN LACK and Swiss Banker S.L., Customer 3 signed documents to open an undeclared account at Cantonal Bank in the name of the nominee tax haven corporation and provided Cantonal Bank with a copy of Customer 3's United States passport.

65.     In or about 2003, at a meeting in Miami, Florida, Customer 3 gave defendant MARTIN LACK approximately $50,000 in cash, that defendant MARTIN LACK stated he would distribute to his United States customers who needed withdrawals from their undeclared accounts at Cantonal Bank.

66.     In or about 2003, after receiving cash from Customer 3, defendant MARTIN LACK provided Customer 3 with a receipt for the $50,000 deposit to Customer 3's undeclared bank account and cautioned Customer 3 not to retain the document.

67.     In or about 2006, at a meeting in Chicago, Illinois, Customer 3 gave defendant MARTIN LACK approximately $50,000 in cash for deposit into Customer 3's undeclared account at Cantonal Bank.

68.     In or about 2006, at a meeting in Chicago, Illinois defendant MARTIN LACK instructed Customer 3 not to call him from a U.S. phone line and gave Customer 3 a cell phone, stating that it was to be used for the sole purpose of calling defendant MARTIN LACK in Switzerland to set up future meetings in the United States.

15

69.     In or about 2008, defendant MARTIN LACK advised Customer 3 that if Customer 3 disclosed the undeclared account at Cantonal Bank to the IRS, Customer 3 would forfeit approximately 50% of the assets in the account.

Customer 4

70.     On or about September 21, 1993, Customer 4, a United States citizen and resident of Florida, received a letter in Miami, Florida from UBS that stated that defendant MARTIN LACK would be the new relationship manager for the undeclared account at UBS that was maintained in Customer 4's own name.

71.     In or about 2002, defendant MARTIN LACK left UBS's employ yet continued to manage Customer 4's undeclared account at UBS, with Customer 4's permission for MARTIN LACK to make any changes in investments without Customer 4's approval.

72.     In or about Fall 2006, defendant MARTIN LACK transferred the contents of Customer 4's undeclared account at UBS held in Customer 4's own name to a new undeclared account at UBS that defendant MARTIN LACK had opened in the name of a nominee tax haven entity trust.

73.     In or about 2007, defendant MARTIN LACK closed Customer 4's undeclared account at UBS, opened a new undeclared account at Cantonal Bank for Customer 4, and transferred into the Cantonal Bank account the contents of the undeclared account at UBS.

74.     In or about 2007, defendant MARTIN LACK informed Customer 4 that he had opened a new undeclared account for Customer 4 at Cantonal Bank because Swiss bank secrecy laws were changing and defendant MARTIN LACK feared that UBS was going to provide the IRS with account information for UBS's United States undeclared customers.

16

75.     In or about 2007, at a meeting in Coconut Grove, Florida, defendant MARTIN LACK and Customer 4 discussed Customer 4's undeclared account at Cantonal Bank, and defendant MARTIN LACK provided Customer 4 with a performance report.

76.     In or about 2008, at a meeting in the United States, Customer 4 met with an associate of defendant MARTIN LACK who proposed transferring the contents of Customer 4's undeclared account at Cantonal Bank into a life insurance policy.

77.     In or about 2008, at a meeting in Coconut Grove, Florida, defendant MARTIN LACK and Customer 4 discussed Customer 4's undeclared account at Cantonal Bank, and defendant MARTIN LACK provided Customer 4 with a performance report.

78.     In or about 2008, at a meeting in Coconut Grove, Florida, in response to Customer 4's question regarding the purpose of transferring the contents of the undeclared account at Cantonal Bank into a life insurance policy, defendant MARTIN LACK explained that such a transfer would serve to keep the funds out of the "claws of the United States."

79.     In or about 2008, in response to a question from Customer 4 regarding the state of Swiss bank secrecy laws, defendant MARTIN LACK responded that the laws were still "rock solid."

Customer 5

80.     In or about 2000, at a meeting in Chicago, Illinois, defendant MARTIN LACK met with Customer 5, a United States citizen and resident of Illinois, to discuss Customer 5's undeclared account at UBS.

81.     In or about 2002, at a meeting in Chicago, Illinois, defendant MARTIN LACK told Customer 5 that he was planning on leaving his employment at UBS because UBS would

17

have a physical presence in the United States and that the accounts for U.S. customers would not be "secret" for long.

82. In or about 2003, at a meeting in Chicago, Illinois, defendant MARTIN LACK advised Customer 5 to close the undeclared account at UBS and transfer the contents to a new undeclared account at Cantonal Bank because the account at Cantonal Bank would be "secret" because the bank had no affiliation with the United States.

83. In or about 2003, at a meeting in Chicago, Illinois, Customer 5 signed documents provided by defendant MARTIN LACK to open an undeclared account in the name of a nominee tax haven entity at Cantonal Bank.

84. In or about 2006, defendant MARTIN LACK advised Customer 5 to transfer nominal ownership of the undeclared account at Cantonal Bank from one nominee tax haven entity into another nominee tax haven entity.

85. In or about 2006, at a meeting in Chicago, Illinois, defendant MARTIN LACK provided Customer 5 with various documents to establish a nominee tax haven entity .

<u>Customers 6 and 7</u>

86. In or around 2005, at a meeting in Geneva, Switzerland, Customer 6, a United States citizen and resident of Florida, and Customer 6's sibling, Customer 7, a United States citizen and resident of New Mexico, each opened undeclared accounts at Credit Suisse AG to hold precious metals that they had inherited.

87. In or around March 2009, after meeting with a banker at Bank Julius Baer in Zurich, Switzerland who rebuffed Customer 7's attempt to open an account but who provided names of independent asset managers who could open accounts for Americans at Swiss banks,

18

Customer 7 met with defendant MARTIN LACK who stated that he had a special relationship with Cantonal Bank and that he could open an account for Customer 7.

88.     In or around March 2009, at a meeting in the offices of Lack & Partner Asset Management in Zurich, Switzerland, Customer 7 signed documents provided by defendant MARTIN LACK to open an undeclared account at Cantonal Bank.

89.     In or around March 2009, at a meeting in the offices of Lack & Partner Asset Management in Zurich, Switzerland, defendant MARTIN LACK gave Customer 7 the option to sign a Form W-9 for the undeclared account at Cantonal Bank, which Customer 7 declined.

90.     In or around April 2009, on the advice of Customer 7, Customer 6 met with defendant MARTIN LACK at his office in Zurich, Switzerland, at which time defendant MARTIN LACK informed Customer 6 that Cantonal Bank would no longer open accounts for United States customers.

91.     In or around April 2009, in a telephone call a few hours after the meeting in Zurich, Switzerland, defendant MARTIN LACK agreed to open an undeclared account at Cantonal Bank for Customer 6 in the name of a nominee, a friend of Customer 6 who was a citizen of Spain ("Nominee #1").

92.     In or around April 2009, following the phone conversation between defendant MARTIN LACK and Customer 6, Customer 6 traveled to Geneva, Switzerland, where Customer 6 withdrew the gold and platinum bars from the safe deposit box at Credit Suisse, brought them to Zurich, and placed them in a hotel room safe.

93.     In or around April 2009, the day after Customer 6's first meeting with defendant MARTIN LACK, Customer 6, Nominee #1, and defendant MARTIN LACK met at the offices of

19

Lack & Partner Asset Management in Zurich, Switzerland, at which time Nominee #1 signed documents to open an account at Cantonal Bank.

94. In or around April 2009, at a meeting between Customer 6, Nominee #1, Swiss Banker S.L., and defendant MARTIN LACK at Cantonal Bank in Zurich, Switzerland, Customer 6 provided Swiss Banker S.L. with gold and platinum bars to be deposited into the account opened in the name Nominee #1 and Customer 6 signed a document that gave Customer 6 power of attorney over the account at Cantonal Bank.

Customer 8

95. On or about March 4, 2009, at a meeting in Zurich, Switzerland, after Customer 8, a legal permanent resident of the United States and resident of Massachusetts, had been informed by a UBS banker that UBS was closing Customer 8's undeclared account, Customer 8 was introduced to defendant MARTIN LACK who was described as having connections at Swiss banks that would open undeclared accounts for U.S. persons.

96. On or about March 4, 2009, at the same meeting with defendant MARTIN LACK, Customer 8 signed documents to open an undeclared account at Cantonal Bank, at the behest of defendant MARTIN LACK chose the "code name" "Chalet" for the undeclared account, was told by defendant MARTIN LACK that Swiss Banker S.L. would be Client 8's banker at Cantonal Bank, and signed a letter, dated March 7, 2009, addressed to UBS that directed the bank to transfer the contents of the undeclared account to Cantonal Bank, at the attention of Swiss Banker S.L.

Customer 9

97.     On or about June 7, 2008, Customer 9, a United States citizen and resident of San Francisco, California, sent UBS AG a letter instructing the bank to transfer the contents of Customer 9's undeclared account at UBS AG to a new undeclared account at Cantonal Bank, which was managed by Renzo Gadola.

98.     On or about April 15, 2009, Customer 9 failed to file a Form 1040, Individual Income Tax Return, reporting the undeclared accounts at UBS AG or Cantonal Bank.

99.     On or about November 22, 2010, during a phone call between Customer 9 and Renzo Gadola in Broward County, Florida, that was recorded by law enforcement, Customer 9 told Renzo Gadola that Customer 9 had no intention of disclosing to United States authorities the undeclared account at Cantonal Bank.

100. On or about November 25, 2010, Client 9 sent an e-mail to Renzo Gadola in Broward County, Florida, in which Customer 9 discussed the performance of the undeclared account at Cantonal Bank.

All in violation of Title 18, United States Code, Section 371.

A TRUE BILL.

_____
WIFREDO A. FERRER
UNITED STATES ATTORNEY

_____
BERTHA R. MITRANI
ASSISTANT U.S. ATTORNEY

_____
KEVIN M. DOWNING
SENIOR TRIAL ATTORNEY
MARK F. DALY
MICHELLE M. PETERSEN
TRIAL ATTORNEYS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

vs.

MARTIN LACK,

              Defendant.
_____/

CASE NO. _____

## CERTIFICATE OF TRIAL ATTORNEY*

Superseding Case Information:

**Court Division**: (Select One)

New Defendant(s)      Yes _____ No ____
Number of New Defendants _____
Total number of counts _____

____ Miami    ____ Key West
**X** FTL    ____ WPB    ____ FTP

I do hereby certify that:

1.    I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.    I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.    Interpreter:    (Yes or No)    NO
    List language and/or dialect    _____

4.    This case will take    3    days for the parties to try.

5.    Please check appropriate category and type of offense listed below:

    (Check only one)                 (Check only one)

| | | | |
|---|---|---|---|
| I | 0 to 5 days | **X** | |
| II | 6 to 10 days | | |
| III | 11 to 20 days | | |
| IV | 21 to 60 days | | |
| V | 61 days and over | | |

| | |
|---|---|
| Petty | |
| Minor | |
| Misdem. | |
| Felony | **X** |

6.    Has this case been previously filed in this District Court? (Yes or No)    NO
If yes:
Judge: _____    Case No. _____
(Attach copy of dispositive order)
Has a complaint been filed in this matter?    (Yes or No)    NO
If yes:
Magistrate Case No. _____
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of _____
Defendant(s) in state custody as of _____
Rule 20 from the _____    District of _____

Is this a potential death penalty case? (Yes or No)    _____

7.    Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?  _____  Yes    **X** No

8.    Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?  _____  Yes    **X** No

_____
BERTHA R. MITRANI
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No./Court No. 88171

*Penalty Sheet(s) attached

REV 4/8/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: **MARTIN LACK**

**Count #: 1**

**18 U.S.C. § 371**

**Conspiracy to Defraud the United States**

\* **Max.Penalty**:      5 years' imprisonment, 3 years supervised release, $250,000 fine

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**